Mr. Bush, you were appointed under the Criminal Justice Act, and we appreciate your acceptance of the appointment. Thank you. It was my pleasure. May I please the court? My name is Patrick Benka, and I represent the appellant, Ron White. Mr. White was arrested on November 22, 2011, in a little town outside Searcy, Arkansas. He was pulled over by a trooper by the name of Officer Denny, and that stop was the result of a three- or four-minute investigation that took place prior to that time. What happened was the troopers of the investigation, including Officer Trooper Denny and another gentleman by the name of Dane Peterson, were conducting surveillance on a gentleman who you're going to hear from and his attorney, Mr. Rojas Olivier. I'm going to refer to him as Mr. Rojas from this point forward. They were conducting an investigation. The investigation was very fact-intensive. It took a very long time. It included surveillance, phone taps, and I guess contact with confidential informants. So it took place over a long period of time. Mr. White was at a business that was operated by someone who was known to the government at that time who was working, who apparently was involved in the drug transactions with Mr. Rojas. They went to that establishment after Mr. Rojas left his house early in the morning and went to the business. The business was, I guess, a car dealership. A body shop, wasn't it? A body shop, car dealership. It was a combination of a number of things, but it was a business. Was it open at the time that everyone showed up? It's unclear. I know that what happened is not clear on the record in hindsight. You always think of these things. But what happened was they followed Mr. Rojas about 8.30 in the a.m. to Mr. Struthers' business, and then the stop occurred at 9.30, so they talked about how they were out there for some period of time. It was never detailed in the record as to how far they were, but I'm assuming that at the time that they got to the business or around that time, it was open. It was 9 o'clock roughly by the time that my client, Mr. White, had left the business. Everybody says they weren't there long. Does the record establish how long they were there? It doesn't. The only way that I'm able to deduce that it was some period of time was the fact that Mr. Rojas left his house at 8.30, and then the stop took place at 9.30, so I'm assuming that they were there for some period of time. Well, no. Now, we got the driving around in there, counsel. You have the driving around from getting there and the driving around, the evasive maneuvers. I apologize for that, Your Honor. I can tell the court. I'm familiar with the area, so it's easy for me to be able to say to the court that it's not too long, it's not too far away. I would imagine that the stopping and going took approximately five minutes, and that's just because I'm familiar with the area. I understand that you don't have to take that as part of the record, but it didn't take very long. I'm assuming that a lot of the time was spent at the business doing surveillance on Mr. Rojas, and then during this period of time is when they started running the vehicle license plate numbers. It was during that vehicle license plate number check that Trooper Denny, yes, I'm sorry, that Trooper Denny recognized one of the individuals or the vehicle of one of the individuals because he had had contact with that gentleman, Mr. White, my client, approximately seven years prior during an arrest that took place for drug-related activity. So based upon that information. Did he, in fact, have a conviction? He did. He did, back from 2004. There was some reference in the record that he had another contact with him, but that wasn't an arrest. That was actually an issue that dealt with a family member of Mr. White's, not Mr. White exclusively, and I think that took place back in 2007. So armed with this information, they follow Mr. Rojas to this business. They run the tags. The tags come back to my client, Ron White, and based upon that information and the fact that Mr. Rojas was there, Dane Pettersen, who was one of the individuals who indicated that he was there, said that he was going to go ahead and stop that vehicle, and he indicated to Mr. Pettersen or to Trooper Denny to do so. So Mr. White, and I think what's important to point out is at the time that they surveilled Mr. Rojas leaving his residence, they saw him leaving his house. He had nothing in his hand. He put nothing in the vehicle, and I know that the government's position is that that vehicle contained a place to secrete drugs, and they were aware of that through some information they received from confidential sources. So it was that vehicle that left with Mr. Rojas, went to the business of Mr. Struthers. Now, what's clear is that Mr. Rojas went into the car and exited the vehicle with nothing in his hands. In fact, some of the wiretaps that were discussed during the hearing was that Mr. Struthers had said on those wiretaps to Mr. Rojas, don't bring anything over here. And that was on approximately about a week and a half prior to this stop, or a week I think it was. I think it was November 15th, if I recall correctly. So, nothing goes in, nothing comes out. There's no indication that Mr. White had any contact with Mr. Rojas or Mr. Struthers while he was in the business. They had come at some point after that, and then Mr. White leaves the business, nothing in his hands. Gets in the vehicle, and then he leaves. And that's when Dane Pedersen decided that he was going to stay. Before you get to your rebuttal, what about what the government says the officer thought was evasive maneuvers of keep turning off the road anytime he would see the police? Here's what's important about that. Obviously, we didn't have any videotape with regard to what happened the first time that he allegedly pulled off. But what the trooper did acknowledge is that he did go into a convenience store, was in there for a brief period of time, and then he left that convenience store. And then the officer was set up awaiting for him to start coming down the same road that he was traveling down, which I thought was interesting. If Mr. White was clearly trying to evade, I think that the last thing that he would do is head out in the same direction that he headed in. The road then that he did end up turning off onto, which is on the video, is that a well-used road? Yes. Is that something that leads to a lot more, or is it just a country road? Sure. Matter of fact, there was actually, Mr. White was actually going to a friend's house on that, and I think that's clear on the record that he was going down that road to visit with a friend. And the reason why I say that, Judge Kelly, with regard to the trooper indicates that he evaded when he went to the convenience store. Well, Trooper Denny also stated that he got right behind him, and as soon as he got behind him, he used his blinker to turn into lane. Well, that's not how it appeared on the video. On the video, Officer Denny is in the right-hand lane, kind of following him, and I guess kind of off his right rear. There's two lanes there. And then you see Mr. White pull into the middle section to make that turn, and then that's when you see Officer Denny kind of go over to that lane, go into two lanes, and then follow him. So what he's reported and what he had to testify to or what was in the tape was far different than that. There was no reasonable suspicion. I've never really seen the case. I mean, essentially, he got pulled over because of his past from 2007, and because he was at a business during daylight hours, leaving that business, nothing in his hands, and that's the reason why he got stopped. So I'm going to save the rest of my time for rebuttal. Thank you. Thank you. We'll hear from Mr. Bush. May it please the Court. Winston Churchill once said that if Hitler invaded hell, then he, Churchill, would make at least a favorable reference to the devil in the House of Commons. I'm going to do something a little crazy and ask you to assume for the moment that my client, Jorge Rojas Oliveira, is a devil. The record does reflect that he was connected to the distribution of approximately 125 to 155 pounds of methamphetamine. He made threats to kill people and cut off their heads. There was testimony that he attempted to solicit the murder of a cooperating source. He had an unloaded handgun at his home with a loaded magazine nearby at the time of his arrest. As for his co-defendant, Michael Mielke, who was a cooperating witness for the government against my client, I don't really like Nazi analogies, so I'm just going to say that the devil is in the details. He was connected, the record shows, to the distribution of approximately 59 to 79 pounds of methamphetamine. He led law enforcement officers on a high-speed chase, during which he had crystal methamphetamine and a loaded handgun in his pickup truck. They had to set up spikes in the road to blow out three tires on his truck. He then continued fleeing with three flat tires, driving on three flat tires and rims, while also trying to run an officer off the road onto a bridge. When he finally stopped, he exited his truck, only to reenter it, and Officer Liskam testified regarding his belief that he was attempting to retrieve that loaded handgun to use on law enforcement officers. This testimony, I should note for the record that Officer Liskam's testimony was credited entirely by the trial court. The trial court stated he would credit his testimony. My client was no angel, no doubt about it. While he made numerous statements and threats that had extremely violent overtones, he did not personally take action himself to try to harm someone, and in particular, to try to harm law enforcement officers. Unlike my client, Mr. Mielke was also convicted in this case of illegal possession of a firearm in furtherance of a drug trafficking crime. Unlike my client, Mr. Mielke had an extended history of criminal convictions for felonies and misdemeanors, including burglary, selling marijuana, criminal impersonation, possession of methamphetamine and drug paraphernalia, and illegally carrying a weapon. Mr. Mielke liked guns. The record shows he was a felon in possession of a Tommy gun, which he traded for methamphetamine, as he did with other guns. He possessed firearms, including an assault rifle, during drug transactions. When he testified in my client's sentencing hearing, he flatly denied having a loaded gun during the law enforcement chase. Just a few minutes later, he testified that he did not know if that gun was loaded. One of those statements was not true, and both were under oath. Unlike Mr. Mielke, my client did not take the witness stand and commit perjury. Now, the Eighth Circuit, Your Honors, reviews sentencing decisions for reasonableness, which it has described as a standard akin to traditional abuse of discretion. And even when a court considers the factors in 3553A, it can constitute an abuse of discretion if the court commits a clear error of judgment in weighing those factors. Now, after acknowledging that the sentence being imposed on my client was, and I quote, far and away the greatest, end quote, of all the defendants in the matter, the trial court nonetheless then stated, and I'm quoting again, that, quote, Mr. Rojas Olivares is far and away the most culpable, end quote. I contend that this rationale was a clear error of judgment in applying the pertinent statutory language, and therefore an unreasonable abuse of discretion. If you look at the totality of the record here, Mr. Mielke and my client were similarly situated defendants within the meaning of the statute. Well, counsel, we have the Bowie case and Kane case and two or three cases that say a defendant is not similarly situated to a co-defendant where he pleads guilty and cooperates with the government. Well, Your Honor, I guess I would distinguish those and discuss Mr. Mielke's testimony and how, number one, he committed perjury under oath. And also, while I'm not familiar with all the factual particulars of the cooperating witnesses in those cases, as I'm describing here, Mr. Mielke was a rather unique individual with an extended history. Do you know what their respective guideline ranges were? Your Honor, I'm trying to recall. My client's guideline range was life. And Mr. Mielke's I can't recall exactly, but I want to say it was maybe between 25 and 30 years. I would note that even though the Lazenby Court found that one of the two co-defendants was more culpable than the other, they were still held to be, and I'm quoting, defendants with similar records who have been found guilty of similar conduct. And I would point out that the statute requires that they be similarly situated, not precisely situated. Isn't Lazenby overruled? Well, it did get remanded. No, I'm sorry. We said in the McDowell case it is suspect. We've thrown off on it two or three times. Isn't it overruled? Well, I don't know if it's been overruled. The court has stated it's suspect. I know there have been Eighth Circuit cases. I think the Cain case actually mentioned that Lazenby might still have some merit. And it strikes me that there may be a conflict between panels here, although I've seen some decisions. Well, is there more of a conflict between sentencing regimes? As the McDowell case points out, Lazenby was back in the time when we were, I started to say micromanaging, when we were taking a closer look at the district court and their sentences. And you know about our Feimster and Bank case where we say it's going to be a rare case that we're going to question what the district judge does on sentencing. So are we in a different regime now? You know, we were playing one sport then. We're playing a different sport now. We're doing a different fashion show then and a different fashion show now. Right. I guess, you know, I would say with respect to that, Your Honor, that the facts here are more extreme with Mr. Milkey if you compare Lazenby and Godwin. I believe that Lazenby was the more culpable in that case. But nonetheless, it was a pretty close call from what I saw. And here, my client is no angel. He distributed more methamphetamine than or was involved in more methamphetamine than Mr. Milkey. But on the other hand, with Mr. Milkey, we're talking perjury and extended criminal history, possibly trying to kill law enforcement officers. So I think it's a bit distinguishable in that respect. Even if you affirm the fact findings that I'm challenging, which I'm not going to address a lot due to time limitations, the point remains that, unlike my client, Mr. Milkey did, in my view from the record, attempt to take affirmative action to harm law enforcement officers. He was obviously involved with large quantities of methamphetamine, Mr. Milkey. Maybe not as much as my client, but nonetheless large quantities. And especially when coupled with his other extremely aggravating factors in this case, this demonstrates that these two are, quote, remarkably similar participants in the same criminal conspiracy, end quote, within the meaning of Lazenby. And my client got 35 years. Mr. Milkey got 13 and a half at his sentencing hearing. In 1986, and I know I'm going way back here, while Congress was considering amendments to the Sentencing Reform Act, Judge William Wilkin, who was then chair of the U.S. Sentencing Commission, testified before a congressional committee and said, quote, disparity in my judgment is the one ill that needs the most attention in our judicial system, end quote. I would ask this honorable court to reflect on that statement and request that the case be reversed and remanded for the trial court to make a new sentencing decision based on the current record. Thank you. Thank you, Mr. Bush. We'll hear from the government. May it please the court, counsel. My name is Stephanie Mazanti, and I represent the government in this case, the United States. And I would ask this court to uphold the district court's findings in the Ronald White case that the motion to suppress should be denied, and to also uphold the sentence in the Jorge Rojas Oliveira case. I'll address the Ronald White case first. And I would point out that there are many other factors that the court considered, aside from those noted by defense counsel in this case, that led to the conclusion that there was reasonable suspicion to make this stop in this case. And I would emphasize the reasonable suspicion is all we are required to have here. Specifically, defense counsel mentioned that essentially all we have is some people's past history of narcotics and people meeting together at a business. That's not all we have. We also have an extensive investigation of Jorge Rojas Oliveira that involved wiretap calls between he and Mr. Struthers. And so we had very established facts that Mr. Rojas Oliveira was a multi-pound distributor of methamphetamine based not only upon those wiretap calls, but also upon surveillance and evidence obtained from confidential informants, controlled buys. And so we have a source of supply of methamphetamine meeting with two other individuals who have a history not only of narcotics violations, but specifically methamphetamine violations, meeting at a business, and what law enforcement in their experience described as what appeared to be consistent with a narcotics trafficking meeting. Well, tell us some details. You know, your brief says they were there shortly. I think your word, shortly. How long shortly? What does the record show about how long they were there and, you know, that kind of stuff? Your Honor, I believe that the testimony of Mr. Scarborough, Officer Scarborough, was that they were there for less than five minutes. And we also have on page 8 of the record the testimony of Michael Brooks, who is an investigator with the North Little Rock PD, that Mr. Rojas Oliveira was back at his house within 13 minutes. And so he left his house and was back at his house within 13 minutes, which shows you the duration of the actual meeting that took place at the business. So you say the meeting was consistent with a distribution. What is it that makes it consistent with a distribution? Your Honor, in many cases, and what the officers, I believe, were referring to, is that whenever they investigate narcotics trafficking activity, they typically observe very short meetings at locations between people with narcotics history. In addition to that, we also had, in this specific case, the fact that Mr. Rojas Oliveira had multiple vehicles, but chose to bring the vehicle with him that he used to transport methamphetamine. He drove the vehicle he used to transport methamphetamine particularly to this meeting location. And so we have that coupled with the fact that he's meeting with these particular individuals for a short period of time and then the subsequent attempts at evasion. Okay. Describe those and tell us, and again, I've not looked at the record. I'm relying on your briefs. Tell us what the record really says about these, what you call evasion. Your Honor, the trooper testified that whenever, each time he got behind the defendant, Mr. Rojas. Well, now, how many times is that when you say each? Two times. Okay. Each of the two times. Go ahead. Each of the two times that he pulled in behind the defendant in this case, he almost immediately pulled off in one way or another. The first time, he pulled off and went to an area, the Velvet Bridge area. And while Mr. Benka indicated that there was testimony that the trooper said he went into the convenience store, there was no testimony that he went inside the convenience store. The testimony of the trooper was that he could not observe whether he went in or did not go in the convenience store at that time, but that the defendant was on or off that exit and back on within a minute. And so he must have run if he had gone in anywhere. So we have that first evasion. Trooper immediately pulls behind the defendant, and he immediately gets off the road. Then the defendant gets back on the road. The trooper, again, starts to pull up behind him, and he almost immediately makes a left-hand turn onto a side road. And so I would submit that that is consistent with evasive activity, which is similar to that in Dottie, and that we have far more facts here to support reasonable suspicion than the court in Dottie had where it upheld the reasonable suspicion for the Terry stop. At the meetings, counsel said that all the participants were observed going in and out, carrying nothing. Is that accurate? That is accurate, Your Honor. There was no testimony that anyone observed any of the participants in the meeting carrying anything in or out of that meeting. Were they able to see him at all times necessary? That's not clear from the record. However, I would also point out that Judge Holmes expressly addressed this issue because Mr. Benka, after Judge Holmes denied the motion on the record, Mr. Benka raised that point to Judge Holmes, and he said that he recognized that fact, but he regardless held that there was reasonable suspicion and noted that it's very possible to secret methamphetamine on a person, on their body, to where the law enforcement officers would not necessarily have seen the methamphetamine. What time of the year did this happen, counsel? It was in November of 2011. Any testimony about coats or anything like that? There was no testimony about coats. There's not a video of this, is there? There is not. We get videos in so many cases. Thank you. With regard to Mr. Rojas-Oliveira, I would point out, first of all, that under the Spencer case, Mr. Rojas-Oliveira was subject to a life guideline range. He only received 35 years in comparison to that life guideline range. And the Spencer court, along with several other courts, have determined or have mentioned that it almost never happens that whenever someone receives a below guideline range that they're going to be reversed and told that they have to sentence them to an even further reduction below what was already given in a variance. I would also point out, Your Honor, that with regard to the substantive reasonableness, which was the primary arguments that counsel for Mr. Rojas-Oliveira addressed, that the disparate sentences here in Lazenby and other cases, whenever they talk about disparate sentences, you have completely similarly situated defendants. Here, Mr. Rojas-Oliveira and Mr. Mielke are very different. In large part, and I think the biggest difference between the two of them is that Mr. Mielke is the reason that the government was able to get to Mr. Rojas-Oliveira in large part because of his cooperation, his extensive cooperation with the government. Was his cooperation mostly useful at sentencing, or was it to make the initial case against him for an indictment? It was from the investigation on. Mr. Mielke was a source in the application to obtain the Title III wiretap, which led to much of the evidence against Mr. Rojas-Oliveira in the case. He also provided information about many of Mr. Rojas-Oliveira's methods, including the use of the Mercury Grand Marquis that we've discussed before, so that law enforcement would have information about how Mr. Rojas-Oliveira transported his methamphetamine. He proffered multiple times and then ultimately testified at Mr. Rojas-Oliveira's sentencing. When Mr. Rojas-Oliveira refused to take any sort of responsibility for what he did, he contested almost every sentence of the PSR. And so the government was put in a position to essentially have a mini-trial, and whenever we're put in that position, we often have to rely on the testimony of co-conspirators because they are the people with that information that can be used to help the government prove their case. And so additional… Do you recall what Mr. Mielke's guideline range was? Yes, Your Honor, it was 262 to 327 months originally, but he did receive a reduction for his substantial assistance in the case, as did some of the other co-defendants. And we were put in that position in part because of Mr. Rojas-Oliveira's refusal to accept responsibility and to frivolously contest most of the relevant conduct in this case. When you say frivolously, the district court didn't find frivolously, did he? The district court didn't specifically say that contesting the allegations in the PSR were frivolous. However, whenever you look at the fact that the district court affirmed almost everything that the government tried to prove in that case, I would say contesting every sentence in a PSR would be frivolous in that case, including the indictment language, which is essentially just it is what it is, the indictment language. With regard to Mr. Rojas-Oliveira, counsel has acknowledged that Mr. Rojas-Oliveira was definitely no angel, and I would agree with him that Mr. Mielke was no angel either. I agree on both points, and I made those points at Mr. Mielke's sentencing, and I made those points at Mr. Rojas-Oliveira's sentencing. However, Mr. Rojas-Oliveira, as counsel has conceded here today, distributed quite a bit more methamphetamine than Mr. Mielke did. In addition to that, Mr. Rojas-Oliveira is caught on a wiretap discussing cutting people's heads off. We also have testimony about him having conversations about a murder in Guatemala where he's encouraging that sort of action. In addition to that, we had information on the wiretap where he discusses hiring a hitman to kill one of his distributors for failure to pay for $3,000. And defense counsel pointed out that Rojas did not personally take actions to harm other people. That's right. He used other people to do his dirty work. He did many things himself, but as the record reflects, he likes to use other people to do his bidding, and that's exactly what he did with Mr. American. And he went to Mr. American and attempted to have Mr. American clean up his mess by taking care of a confidential informant that was a government witness. And I say take care of, and I think that's interesting because a lot was made of the verbiage used by Mr. American. But when it comes down to it, the testimony was, and the district court credited Mr. American's testimony in that regard and found that Mr. Rojas Oliveira attempted to solicit the murder of a government witness, and that is the biggest distinction between Mr. Rojas Oliveira and Mr. Mielke. When Mr. Mielke got caught, he cooperated with the government. When Mr. Rojas Oliveira got caught, he did the opposite. He attempted to solicit the murder of a government witness. He contested every allegation, and he fought us tooth and nail the entire time. The district court pointed out in sentencing Mr. Rojas Oliveira that he would not have received the same sentence but for all of this violence that was involved in this case. And I think that is the biggest difference between Mr. Mielke and Mr. Rojas Oliveira. With regard to the factual determinations made by the court, a couple of the arguments in defense counsel's brief, I don't believe the district court actually made those specific factual findings. Specifically, Mr. Rojas Oliveira had multiple pounds of methamphetamine in his residence. I think what the district court found from what I could tell from the record was that he did distribute methamphetamine from his home, and then he stored methamphetamine from his home. But if the court wanted to make that finding, there was plenty of evidence to make a finding of multiple pounds of methamphetamine at Mr. Rojas Oliveira's house. In addition to that, I don't find anywhere in the record where the court found that Mr. Rojas Oliveira threatened Mr. American. I think the opposite is actually true. I think the court did not credit Mr. American's testimony in that regard because it could not be further corroborated. With regard to the evidence that Mr. Rojas Oliveira was involved in methamphetamine distribution prior to meeting Mr. Mielke, I think there's ample evidence from the record to support that finding, and there is no clear error. The credibility determinations of Judge Holmes are virtually unreviewable on appeal, and in making this determination, he took into account the testimony before him and made credibility determinations. Specifically, there was testimony from Terry Green that he began receiving methamphetamine from Rojas Oliveira in late 2009 through October of 2010. There was also testimony that Garcia Garcia, Selvin Garcia Garcia, indicated that he had sold methamphetamine for Rojas Oliveira for two years prior to his December of 2011 arrest. We also have the testimony of Michael Mielke that he was involved with an individual that he called Primo, and another individual that he referred to as either Juan or Raul prior to his exclusive dealing with Mr. Rojas Oliveira. And the testimony in this regard indicates that Mr. Rojas Oliveira was involved with Juan or Raul and with Primo, and that once Primo left town due to the big winter indictment, that that's when Rojas Oliveira started exclusively dealing with Mr. Mielke. There was no longer another individual involved at the transactions. We also have the testimony of Kristen Birmingham, indicating that there was a three-month period prior to July of 2011 where the two were interacting with one another in methamphetamine trafficking. With regard to the arguments that Mr. Rojas Oliveira solicited the murder of a confidential informant through Mr. American, the district court found that the testimony of Mr. American was corroborated and that there's no way and no reason that Mr. American would know the identity of the person who went into Mr. Rojas Oliveira's house without talking to Mr. Rojas Oliveira about it and know who the C.I. was. This is early on in the prosecution of the case. And additionally, Mr. American had information that he relayed to law enforcement about the C.I., the confidential informant's name, his place of employment, and where he lived. And the district court found that the way that he knew that was because Mr. Rojas Oliveira had told Mr. American that information. And the only reason to tell him that information was to do exactly what Mr. American had testified to, was to solicit the murder of that confidential informant. I would point out that under the Bates case in 2010, the district court is very free to believe some but not all of a witness's testimony, and that's exactly what he did here. He credited what he thought was reasonable and what could be corroborated. He credited Mr. Mielke's testimony to the extent that he found it reasonable. And in that determination, the district court is in the best position to make the determination about the credibility of the witnesses. He had the live witnesses before him and was able to observe and interact with them and was able to see the case from beginning to end and deal with the 20-plus defendants in this case. To address a few more of the points made by defense counsel, there is some discussion about the gun in Mr. Rojas Oliveira's home. I don't think that there is much dispute, really, that a gun was found in his home and that at least one magazine was found in his home. And the testimony indicated that there were actually three magazines found in the home. There's no contrary evidence. I would also point out, with regard to the high-speed chase of Mr. Mielke, we acknowledge that that was very dangerous activity, and I pointed that out in Mr. Mielke's sentencing. We discussed it on the record in Mr. Rojas Oliveira's sentencing. But that is a similarity between the two in that they both engaged in dangerous conduct. However, I would submit that Mr. Rojas Oliveira's conduct was far more serious, and there was much more of it. With regard to the Ronald White appeal, I also made an attenuation argument in that case in the event that the court finds that there was not reasonable suspicion. However, I think that whenever you compare the Ronald White case with cases like Dowdy and Williams, that you definitely have the reasonable suspicion here, and you don't even need to reach the attenuation argument. In Williams, though, didn't you actually saw what looked like a transaction? Yes, Your Honor. Which is different factually from what we have to, the district court had to sort of say, well, a drug dealer is coming in his drug dealer car to a location and make some inferences from that? Yes, Your Honor. However, I think that while there was more direct evidence about the actual hand-to-hand in Williams, here you have more facts about the investigation leading up to the stop in this case. And you also have, in addition to what appeared to be a narcotics transaction, according to officers who have experience in investigating these types of crimes, you have the evasive maneuvers in the case and the wiretap evidence. About the wiretap evidence, defense counsel focuses on the one call where Mr. Struthers tells Mr. Rojas-Oliveira not to bring methamphetamine. There was another call, though, where Mr. Struthers asked Mr. Rojas-Oliveira to bring him five ounces. And so it's not as if we didn't have any indication that Mr. Struthers was a methamphetamine customer of Mr. Rojas-Oliveira. And when you put all those facts together, under the totality of the circumstances, you have reasonable suspicion. Has Mr. White mentioned in any of the wiretaps? No, Your Honor. For the reasons that I've previously stated and the reasons in my brief, I ask this court to uphold the district court's judgment that the motion to suppress in U.S. v. White should be denied and that Rojas-Oliveira's sentence should be upheld. Thank you. Thank you, Ms. Rosado. Mr. Venker, rebuttal on behalf of Mr. White. Thank you, Your Honor. I've got a minute and a half here just to cover a couple of things. You're correct. The investigation didn't involve Ronald White at all. His name was never mentioned during the investigation or the wiretaps. With regard to the meeting that- I thought there were two references sometime to Mr. White. Where were the two references? No, there were no references. The only references to Mr. White were subsequent as part of the stop. After the event, there were two references because I remember the note of two references. But no wiretap information. They had no information about Mr. White until November 22. With regard to the meeting, Ms. Mazzani spoke about that with regard to the meetings that took place. They saw no meetings. They saw Mr. Rojas go into a business owned by Mr. Struthers and they saw Mr. White come out of a business owned by Mr. Struthers. There's no indication that those two ever met. I think it's a stretch to say so. With regard to Dowdy, and I know that Ms. Mazzani relied upon that. Here's the difference in Dowdy- Was Mr. White there when Mr. Rojas- Apparently, yes. Mr. Rojas went into the business and sometime thereafter, within a couple of minutes, according to Ms. Mazzani's, Mr. White left the business. Did they observe Mr. White? They observed Mr. White leaving, but they never observed any contact between Mr.- Did they observe him go to the building? No. He was already there. He was at the business already. Under Dowdy, you have the facts. You have a deserted pharmacy parking lot on a Sunday night at 10 o'clock. That's distinguishable from this case. Go back to the video of Mr. Trooper Denny pulling over Mr. White. That video will be very telling. It wasn't like he immediately went behind. This went on for a quarter of a mile, and then Mr. White is the one who turned on any signal first, and then Denny got behind him. The cases that are clearly- I'm out of time. Can I finish this real brief with the cases? The Williams case that was cited by the government, you had in that case a drug area, and officers observed what they thought was illegal narcotic street sales out there in front of them. Then also with Watts, you had long guns. You had a time at night. You had someone who's watching this during the time of night. Then Cornelius, which talks about the past history of illegal drug activity. I think that should be a factor, and it's properly so, but that's the only thing that they had in this case. I'm asking you to reverse Mr. White's conviction, grant the motion to suppress, and then have the district court act accordingly. Thank you for your time. Okay. Mr. Bush, any rebuttal on behalf of Mr. Rojas? I'll be brief. I have less time than Mr. Benka. First of all, one of the reasons the judge cited for reducing my client's sentence from life to 35 years was he never took action. We can't say that about Mr. Mielke, and thank goodness we don't have to ask the question what happened to law enforcement officers because they tased him before he could get to the gun. Yes, we contested extensive parts of the PSR, but my client did not take the stand and commit perjury under oath. Did your client get acceptance or responsibility reduction? I know it didn't really matter in the calculation, but was that ruling made by the district court? Yes, he did not give my client acceptance or responsibility. Mr. Mielke's testimony about methamphetamine before meeting my client was very confusing and inconsistent. At one point he claimed he was getting 10 pounds of meth a week from my client based on the DEA agent's report. When I asked him about Mr. Mielke about that, he said the DEA agent was not being truthful. Juan, Raul, Primo, I'll just say generally I recall his testimony being very inconsistent about those various individuals and time frames, and I believe the record will demonstrate that of those three magazines Ms. Mazzanti referenced, I think the DEA was only able to produce a picture of one or account for one, if I recall correctly. I'm a rookie. I thank the court for its time and consideration. We appreciate counsel's arguments.